UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN JOAQUIN VALLEY INSURANCE AUTHORITY,<br><br>Plaintiff,<br><br>v.<br><br>GALLAGHER BENEFIT SERVICES, INC.<br><br>Defendant. | Case No. 1:17-cv-00861-EPG<br><br>ORDER DENYING GALLAGHER BENEFIT SERVICES INC.'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT<br><br>(ECF NO. 53) |

Plaintiff San Joaquin Valley Insurance Company ("the SJVIA"), a joint powers authority, filed suit against its former benefits consultant Gallagher Benefit Services, Inc., ("GBS") on May 11, 2017, in California state court alleging causes of action under California law for (1) professional negligence/malpractice, (2) negligent misrepresentation, (3) breach of written contract, (4) breach of implied covenant of good faith and fair dealing, and (5) violations of California's Unfair Competition Law, Bus. § Prof Code § 17200 *et seq.* (ECF No. 1-1.) GBS removed the suit to this Court on June 28, 2017. (ECF No. 1.)

On August 16, 2019, GBS filed the instant motion for summary judgment, or, alternatively, partial summary judgment ("motion") seeking adjudication of the following issues: (1) whether GBS is entitled to summary judgment due to the SJVIA's failure to adduce evidence of legally cognizable damages; and (2) whether, in the alternative, GBS is entitled to partial summary judgment that amounts of additional premium that the SJVIA could have charged in the past, and any corresponding amount of plan underfunding, do not constitute damages caused by GBS's conduct. (ECF No. 53.) For the following reasons, GBS's motion is DENIED.

1

**I.     FACTUAL BACKGROUND**

Each party filed detailed statements of fact, as well as a response to the other's statement.[1] The Court has reviewed these statements and determines that the following facts and, where noted, factual disputes, are pertinent to the resolution of this motion.[2]

**A.  The SJVIA**

The SJVIA is a joint powers authority, under Title 1, Division 7, Chapter 5, Article 1 of the California Government Code, made up of public agencies with the desire to join together for the purpose of negotiating, purchasing, and funding health, pharmacy, vision, dental, and life insurance for the employees of its public agencies. The two founding members of the SJVIA are the County of Fresno and the County of Tulare. The SJVIA is governed by a Board of Directors made up of publicly elected representatives from the County of Fresno (four board members) and the County of Tulare (three board members).

GBS describes the SJVIA as follows: the SJVIA is a self-funded medical arrangement in which the employer, or risk-pool, is liable for all claims payable under the plan. The SJVIA members are responsible for funding the SJVIA's claim expenses and reserves through member-paid premiums. In each year, a self-funded plan like the SJVIA would ideally collect enough premiums to pay its fixed costs and all the claims submitted by its members, while also maintaining a level of reserves for unanticipated expenses or other liabilities, such as already incurred but not yet reported ("IBNR") claims. As a self-funded plan, the SJVIA bears the risk of its members' claims experience. Indeed, according to GBS, the chief reason the SJVIA exists at all is to reduce costs for its members.

When the SJVIA was originally formed, Fresno County and Tulare County agreed to share solely fixed costs. At the time of the SJVIA's formation. The SJVIA contemplated the possibility of expanding membership to cover other public agencies, and of changing to a "risk sharing" arrangement covering all costs. In 2012, the SJVIA stopped sharing only fixed costs and

---

[1] Each party has made numerous objections to the other's evidence, which the Court has reviewed. (ECF Nos. 57-1, 61-3.) It is not the practice of this Court to rule on all evidentiary objections individually in the context of summary judgment. To the extent an evidentiary objection is pertinent to the resolution of the motion, it is addressed herein.

[2] GBS concedes liability for purposes of this motion only.

2

moved to a "risk sharing" arrangement covering all costs. In 2012, the SJVIA began to add more government entities into its risk pool as members beyond its two founders, adding 23 new non-founder members as of mid-2016.

For its part, the SJVIA disputes GBS's characterization of how the self-insured plan works to the extent it conflates the SJVIA and its members. According to the SJVIA, it, and not the members, is liable for the cost of claims that exceed premiums paid. This is so because, pursuant to Government Code section 6507, as a joint powers authority, the SJVIA is a public entity separate from the parties to the joint powers agreement. And pursuant to the joint powers agreement that established the SJVIA ("JPA"), the debts, liabilities, or obligations of the SJVIA are the debt, liabilities, or obligations of the SJVIA alone, and shall not constitute the debt, liabilities, or obligations of the parties to the agreement, i.e., the County of Fresno and the County of Tulare. Moreover, according to the SJVIA, there is nothing in the participation agreements that indicates that the members are liable for the cost of claims that exceed premiums paid.

The SJVIA also disputes GBS's characterization of the goals of the plan, i.e, collecting premiums from its members no greater than the amount necessary to pay fixed expenses and member claims for the applicable period plan year with sufficient reserves set aside for the potential of unexpectedly high future expenses.

**B. GBS as Benefits Consultant for the SJVIA**

GBS provided benefits consulting services to the SJVIA from January 1, 2010, through December 31, 2016. GBS's contractual requirements included, but were not limited to, strategic planning, financial monitoring and reporting, and developing initial renewal rates using actuarial models and performing the required actuarial valuations. Each year, the SJVIA Board was presented with GBS's premium rate recommendations.

From at least 2010 until 2013, the SJVIA's premiums placed it in a positive net position, in which it was able to cover its expenses and claims experience, as well as having excess funds for reserves.[3]

---

[3] The SJVIA disputes that GBS's cited evidence on this point shows that the SJVIA was in a net positive position for Plan Year 2014.

3

At the end of Plan Year 2012, the SJVIA's total reserves were $11,198,875. According to GBS, for plan year 2013, GBS advised the SJVIA that it had the option to buy down its premium rates by using *some* of the funds the SJVIA collected above what was needed to pay for its liabilities and claims, and the SJVIA took that option, using $2,948,235 in reserves to buy down rates. According to the SJVIA, however, this $2,948,235 amount represented all—not some—of its reserves.

At the end of plan year 2013, the SJVIA's total reserves were $10,764,377. According to GBS, for plan year 2014, GBS advised the SJVIA that it had the option to buy down its premium rates by using *some* of the funds SJVIA had collected above what was needed to pay for its liabilities and claims, and the SJVIA took that option, using $2,609,713 in reserves to buy down rates. Again, according to the SJVIA, the $2,609,713 amount actually represented all reserves above what was needed to pay liabilities and claims, as well as an amount the SJVIA needed to pay their IBNR.

At the end of plan year 2014, the SJVIA's total reserves were $8,244,080. The parties dispute whether the SJVIA could have raised rates to build additional reserves from 2012 to 2014 without some members seeking coverage elsewhere.

According to GBS, for plan year 2015, GBS advised the SJVIA that it had the option to buy down its premium rates by using *some* of the funds the SJVIA had collected above what was needed to pay for its liabilities and claims, and the SJVIA took that option, using $5,366,484 in reserves to buy down the rates. Again, according to the SJVIA, the $5,366,484 amount represented all reserves above what was needed to pay liabilities and claims, as well as an amount the SJVIA needed to pay their IBNR. As a result of the buy down for renewal year 2015, premium rates increased less than 1.2% instead of 7.3%.

**C. The SJVIA's funding crisis and the potential for migration**

In plan year 2015, the SJVIA's claims experience exceeded GBS's projections. The parties dispute the cause for the underfunding. The SJVIA maintains that GBS caused the underfunding through its negligent recommendations and advice, while the SJVIA appears to blame SJVIA's unanticipated high claim experience in 2015. The increased expenses in 2015

resulted in the SJVIA using reserves to pay a portion of the claims expenses, above and beyond the funds already used to buy down 2015 premiums.

According to GBS, for plan year 2016, it presented multiple options to the SJVIA Board, some of which included use of plan reserves to reduce premiums and some which did not. The SJVIA does not dispute this but states that the options proffered by GBS involving use of plan reserves to reduce premiums envisioned the use of all plan reserves above what was needed to pay liabilities and claims—not just some of them.

The SJVIA Board decided to follow one of GBS's proposals that used a buy down to adopt a modest premium increase for 2016. While the SJVIA disputes that it, as an entity separate from its members, received any benefit from the rate buy downs in 2013, 2014, 2015, and 2016, there is no dispute that had the SJVIA not bought down rates in Plan Years 2013, 2014, 2015, and 2016, its premium rates for members would have been higher by an amount corresponding to the buy downs.

Employees of some SJVIA members were able to select, instead of the SJVIA self-funded plan, an option offered by Kaiser Permanente ("Kaiser") through their SJVIA-member employer. The parties dispute whether the Kaiser plan had a lower premium rate than that offered by the SJVIA's self-insured plan.

In 2014, the SJVIA entered into negotiations with Kaiser to adjust rates so as to keep the SJVIA self-funded option competitive with the Kaiser option from a rate perspective. The SJVIA disputes that it directed GBS towards a strategy of setting the rates below actuarially sound levels in order to compete with the Kaiser plan. Kaiser migration took place in 2015, but, according to the SJVIA, there is no evidence cited to show that it was concerned about such migration.

The SJVIA experienced a funding deficit in 2016; again, the parties dispute the main drivers of that funding deficit. The cited evidence shows that the County of Fresno was responsible for most of the deficit.[4] In 2016, the SJVIA Board directed GBS to prepare separate ratings for the County of Fresno, the County of Tulare, and all other members. GBS prepared and

---

[4] SJVIA director Pete Vander Poel testified that, of the $12,528,000 deficit facing the SJVIA, $12,243,716 was attributable to the County of Fresno.

5

presented at a September 2, 2016 SJVIA Board meeting analysis which included a bifurcated rate structure that raised non-founder members' premiums by 26.21%, the County of Fresno's member premiums by 14.49%, and the County of Tulare's members' premiums by 10.89%. At the September 2, 2016 meeting, GBS representatives spoke, recommending against the bifurcated rate option that GBS had been directed to prepare, and in favor of a rate increase that was uniform across each plan option in the entire risk pool. GBS informed the Board that its recommendation against adopting the bifurcated rate structure was due to a concern that other entities would leave the SJVIA plan if the bifurcated rate structure were adopted. The SJVIA Board adopted the bifurcated rate structure after the September 2, 2016 meeting. GBS maintains that this bifurcated rate structure caused nearly all non-founder SJVIA members to exit the SJVIA plan. During the period from September 2016 to October 2016, 15 non-founder members provided notice of their intent to leave exit the SJVIA.

The SJVIA took out loans from the Counties of Fresno and Tulare to address the funding deficit. As of October 1, 2017, the SJVIA had obtained operating loans totaling $5 million from the County of Fresno and $4 million from the County of Tulare.

At the end of 2016, the SJVIA terminated its relationship with GBS and hired a new benefits consultant, Keenan Associates.

**D. The Bednar Report**

Central to this motion for summary judgment is the Bednar Report, which contains the opinions of the SJVIA's lone damage expert, William Bednar. Generally, Bednar opines that, as a result of negligent services provided by GBS, the SJVIA "suffered damages of [$]36,594,106" by losing the opportunity to "raise[] rates on its members" in the amount of $36,594,106 over a "five-year period." Bednar identifies several alleged breaches of the standard of care in GBS's work, each of which, he opines, led GBS to recommend premium rates that were too low. For the SJVIA to have been in the required position according to Bednar, it would have needed to charge its members $36 million in additional premiums over the 2012-2016 period.

**E. The Motion**

On August 16, 2019, GBS filed the instant motion for summary judgment, or,

alternatively partial summary judgment. (ECF No. 53.) GBS seeks adjudication of the following issues: (1) whether GBS is entitled to summary judgment due to the SJVIA's failure to adduce evidence of legally cognizable damages; or (2) whether, in the alternative, GBS is entitled to partial summary judgment that amounts of additional premium that the SJVIA could have charged in the past, and any corresponding amounts of plan underfunding, do not constitute damages caused by GBS's conduct.

The SJVIA filed an opposition to the motion (ECF No. 57.); GBS then filed a reply (ECF No. 61.) The Court held oral argument on September 20, 2019.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the moving party will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremkin v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the moving party meets this initial burden, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Burch v. Regents of Univ. of Cal.*, 433 F.Supp.2d 1110, 1125 (E.D. Cal. 2006) (quoting *Celotex Corp*, 477 U.S. at 324). The evidence of the nonmoving party is "to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "[T]he judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) (quoting *Anderson*, 477 U.S. at 249).

**B. Proximate Causation**

GBS's motion primarily focuses on whether the law of proximate cause forecloses the damages sought in the Bednar Report. The SJVIA's Complaint asserts causes of action sounding in breach of contract and tort, each of which requires the plaintiff to prove proximate causation.

Under California contract law, "when one party breaches a contract the other party ordinarily is entitled to damages sufficient to make that party 'whole,' that is, enough to place the non-breaching party in the same position as if the breach had not occurred." *Postal Instant Press, Inc. v. Sealy*, 51 Cal.Rptr. 365, 368 (Cal. App. 1996) (citations omitted). "Under contract principles, the non-breaching party is entitled to recover only those damages, including lost future profits, which are 'proximately caused' by the specific breach." *Id.* (citing *Metzenbaum v. R.O.S. Associates*, 232 Cal.Rptr. 741 (Cal. App. 1986); *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 277 Cal.Rptr. 40 (Cal. App. 1990)). "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable." *Applied Equip Corp. v. Litton Saudi Arabia, Ltd.*, 869 P.2d 454 (Cal. 1994) (citation omitted). "Whether damages arising from a breach of contract were reasonably foreseeable is a question of fact." *Civic Center Drive Apartments Ltd. Partnership v. Southwestern Bell Video Services*, 295 F.Supp.2d 1091, 1107 (N.D. Cal. 2003).

"The test for causation in a breach of contract (or promissory estoppel) action is whether the breach was a substantial factor in causing the damage." *US Ecology, Inc. v. State of California*, 28 Cal.Rptr.3d 894, 910 (Cal. App. 2005) (citation omitted). "A proximate cause of loss or damage is something that is a substantial factor in brining about that loss or damage." *Id.* (citing BAJI No. 3.76; *Mitchell v. Gonzales*, 819 P.2d 872, 878 (Cal. 1991). "The term 'substantial factor' has no precise definition, but 'it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.'" *Id.* (quoting *Espinosa v. Little Co. of Mary Hospital*, 37 Cal.Rptr.2d 541 (Cal. App. 1995).

8

"For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provide by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." Cal. Civ. Code § 3333. In tort cases, as in contract cases, California has definitively adopted the substantial factor test. *See Vickers v. U.S.*, 228 F.3d 944, 953 (9th Cir. 2000) ("California applies the 'substantial factor' test of legal causation.") (citation omitted).

Proximate cause is rarely an issue suitable to disposition by summary judgment when material facts are disputed. *See Fagerquist v. Western Sun Aviation, Inc.*, 236 Cal.Rptr. 633, 719 (Cal. App. 1987) ("The question of proximate cause is ordinarily a question of fact but becomes one of law where the facts are uncontroverted and only one deduction or inference may reasonably be drawn.").

## III. ANALYSIS

### A. Whether the law of proximate causation prohibits the damages sought in the Bednar Report

GBS attacks the Bednar Report, claiming that damages in the form of uncollected premiums that the SJVIA could have collected in the past are not damages caused by GBS. GBS argues that the legal concept of proximate cause compels this result because Bednar's theory would "force GBS to underwrite and pay for plan funding needs that would have existed in any event, regardless of GBS's allegedly negligent claims projections and rate recommendations." (ECF No. 53, p. 11.) The Court disagrees.

The crux of the Bednar Report is that GBS's alleged deviations from the standard of care (assumed as true solely for purposes of this motion) stifled the SJVIA's ability to pay its claims while maintaining an adequate reserve. While the SJVIA's claim experience might have existed regardless of anything GBS did, the SJVIA maintains that the funds available to meet that need diminished greatly due to underfunding.

The SJVIA has adequately submitted evidence that it collected insufficient funds, or gave away reserves, due to GBS's faulty advice and suffered damage due to the funding shortfall. While the parties vehemently disagree on the extent of any damages but for the allegedly faulty advice, the Court finds this dispute appropriate for a jury based on presentation of facts and expert

9

testimony.

Relatedly, GBS asks the Court to grant summary judgment because damages in the form of uncollected premiums would grant a "windfall" to the SJVIA. There are two primary components to the argument as the Court understands it. First, a windfall would result from such damages because the SJVIA can still recover any plan underfunding attributable to GBS through its current or future members. Second, GBS maintains that the SJVIA exists only to defray costs for its members and their employees; thus, the SJVIA actually received a benefit from GBS's rate buy down recommendations, which resulted in lower premiums for the members. To allow additional damages in the form of uncollected premiums now would award a windfall to the SJVIA.

The Court is not persuaded that these arguments warrant summary judgment. The first argument depends on the premise that the SJVIA will be able to make up for underfunding by asking its current or future members to pay higher premiums to make up the shortfall. The Court finds that whether the SJVIA can make up this shortfall on the backs of its current and future members is a disputed factual question.[5] GBS introduces no evidence showing that members will pay the premiums needed to make up the underfunding allegedly caused by its negligent advice and recommendations. Indeed, GBS's own motion underscores the factual nuances of the argument: on the one hand GBS argues that the SJVIA can neutralize underfunding by asking current or future members to pay higher premiums; yet, on the other hand it chastises the Bednar Report for failing to analyze whether members would have been willing to pay higher premiums from 2012 to 2016.

The second part of the argument is likewise inadequate to warrant summary judgment

---

[5] The Court also notes that, at oral argument, the parties offered different contractual interpretations of the JPA and Participation Agreement bearing upon whether the SJVIA could, as a contractual matter, make up the funding through its current or future members. The SJVIA points to article 4 of the JPA, which establishes that the debts, liabilities, and obligations of the SJVIA are its alone and shall not constitute the debts, liabilities, or obligations of any party to that agreement (the Counties of Fresno and Tulare). The SJVIA also notes that the Participation Agreements only require the members to pay the premium set forth by SJVIA each year—there is no provision by which the SJVIA can collect a shortfall pursuant to the Participation Agreements. In response, however, GBS argues that article 2 of the JPA requires the participating entitles to pay for their respective costs of the program as provided in the Agreement. Moreover, GBS disputes that the Participation Agreements forbid the use of premiums to make up for funding shortfalls. The parties did not brief this issue or request a ruling on contractual interpretation. Nevertheless, this dispute belies GBS' claim that the SJVIA indisputably could be made whole by collecting any shortfall from its members.

because it requires the Court to conflate the SJVIA and its members. But the SJVIA disputes that *it* received any benefit from the buydowns it pursued pursuant to the alleged advice of GBS. The SJVIA instead points to evidence showing that it is a distinct legal entity from its members.Thus, whether the SJVIA received a benefit from the premium recommendations from GBS that it contends were too low is a factual issue, again weighing against summary judgment. Additionally, it is unclear whether the SJVIA's damages from underfunding equal the benefits to the members, especially as that membership has changed over time. That comparison is also best suited for factual and expert testimony and evidence at trial.

Finally, the Court notes that GBS points to no case prohibiting uncollected premiums as a form of damage. GBS references *Eckert Cold Storage, Inc. v. Behl*, 943 F.Supp. 1230 (E.D. Cal. 1996), a malpractice action against an accounting firm and fiduciaries of an ERISA plan for alleged misrepresentation regarding tax benefits of investing. The plaintiff in *Eckert* sought "benefit of the bargain" damages including all tax benefits he was promised. The court refused to award all expected tax benefits because the accountant promised unrealistic benefits—some of the plaintiff's tax liability would have been present no matter what the accountant recommended. GBS claims that, like the plaintiff in *Eckert*, uncollected premiums would put the SJVIA in a better position than it otherwise would have been had GBS's performance been adequate.

But again, regardless of whether the funding need was inevitable, GBS compromised the SJVIA's ability to meet the need. To the extent the Bednar Report attempts to capture the funds the SJVIA would have had but for GBS's alleged breaches, this figure would be proximately caused by GBS. And whether the SJVIA can simply recoup that amount now from its current or future members is, a discussed above, far from sufficiently undisputed to warrant summary judgment.

For these reasons, the Court denies GBS's motion for summary or partial summary judgment that, as a matter of law, the damages described in the Bednar Report are prohibited by the law of proximate causation.

\\\

\\\

### B. Whether the Bednar Report is too speculative to support the SJVIA's damages case

As an alternative argument, GBS suggests that the Bednar Report is too speculative to support damages. GBS notes that a plaintiff must "provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award." *Dolphin Tours, Inc. v. Pacifico Creative Serv. Inc.*, 773 F.2d 1506, 1509 (9th Cir. 1985) (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 263-65 (1946)). GBS references cases in which summary judgment was awarded because of flaws in the plaintiff's proof of damages that were serious and precluded the plaintiff from offering any proof of damages at all. *See e,.g, McGlinchey v. Shell Chem Co.*, 845 F.2d 802, 808 (9th Cir. 1988); *Weinberg v. Whatcom Cty.*, 241 F.3d 746, 751-52 (9th Cir. 2001); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1373 (9th Cir. 1992).

However, balanced against the principle that the jury should not be permitted to engage in speculation is the notion that the Court should not substitute its judgment for that of the fact finder in a "battle of the experts." *See City of Pomona v. SQMN. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat.").

Here, GBS contends that the Bednar Report is inappropriately speculative and insufficient to sustain the SJVIA's damage case for three related reasons.

First, Bednar assumed without analysis that the SJVIA could have raised premiums by $36 million in 2012-2016 without accelerating the non-founder member exits that took place in late 2016 (or causing non-founder members to decide against joining in the first place). Second, GBS argues that Bednar failed to analyze how many of the individual subscriber employees would have accepted the self-funded insurance option if it were higher-priced, noting that the SJVIA member employees could have selected a plan offered by Kaiser instead. And last, GBS claims that "in failing to analyze how member exits and subscriber migration would have impacted premium receipts, Bednar also failed to analyze the SJVIA's claim experience." (ECF No. 53, p. 19.)

In response, the SJVIA disputes that Bednar did not perform *any* analysis on the ability of the SJVIA to collect the proposed higher premiums. The SJVIA points out that Bednar testified

that he did consider potential migration and applied his "actuarial judgment that there is [sic] various scenarios that could occur." (Def. Exh. 6, Bednar 232: 18-21). When Bednar considered migration, he "didn't see any significant migration in 2013 or 2014-2014 or 2015." (*Id.* at 234: 22-25.) Therefore, Bednar stated that an analysis "is extremely difficult because its—its very difficult to determine member behavior." (*Id.* at 238: 6-11.) Further, the SJVIA points out that Bednar also opined that the rate increase calculations prior to the buy downs corresponded with typical medical trend rates, weighing against migration. Finally, the SJVIA attacks as inaccurate key facts that GBS uses to bolster its argument that Bednar's analysis is unduly speculative. For example, the SJVIA disputes that the Kaiser option had or would have had a lower premium rate, which might have caused significant migration of insureds to the Kaiser option upon rate increases.

The Court declines to issue summary judgment based upon potential flaws in the Bednar Report. While GBS highlights valid questions about Bednar's analysis, these issues are not so fundamental as to justify summary judgment. Instead, they are appropriate for trial with the benefit of testimony and cross-examination of the competing expert witnesses.

GBS relies upon *Toscano v. PGA Tour, Inc.*, 201 F.Supp.2d 1106, 1124 (E.D. Cal. 2004), to support summary judgment. But *Toscano*—a non-binding district court opinion—differs from the instant matter in meaningful respects. In *Toscano*, the court found that the expert conducted no counter factual analysis. Here, on the other hand, Bednar testified that he at least considered migration in his analysis. Again, GBS can argue at trial that flaws undermine Bednar's analysis, but the Court does not believe any flaws are so significant as to warrant summary judgment— especially when key facts supporting GBS's argument are disputed. Moreover, *Toscano* was an antitrust case, a well-developed area of law in which the Ninth Circuit has specifically approved means of calculating damages that the plaintiff there failed to utilize. Here, on the other hand, GBS points to no authority—not even persuasive—instructing as to how damages should be calculated under similar facts.

The Court finds that the instant matter involves a factual dispute as to the proper amount of damages, a determination most appropriately resolved through competing experts. *See City of*

*Pomana*, 750 F.3d at 1049. ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat.").

For these reasons, the Court declines to award summary judgment to GBS based upon alleged flaws in the Bednar Report.

**C. Whether a fact issue exists as to why members left the plan in 2016**

The parties also dispute whether GBS's actions were the proximate cause of the non-founder members' mass exit from the SJVIA risk pool towards the end of 2016. GBS argues that the SJVIA cannot collect as damages uncollected premiums from those entities that may have been necessary to pay IBNR claims those members left when they exited because the actions of the SJVIA—specifically declining to adopt GBS's advice warning against a bifurcated rate structure benefitting the counties of Fresno and Tulare—caused these entities to leave the SJVIA. In other words, GBS did not proximately cause damages attributable to the mass exit because the SJVIA's decision to bifurcate rates superseded any negligence on its part.

The Court does not find, however, that the evidence GBS cites in support of this argument *unequivocally* demonstrates the reason why the non-founder members exited the SJVIA. GBS fails to produce evidence that each non-founder member left the SJVIA because of its decision to implement bifurcated rates. At best, GBS produces a series of letters from *some* of the non-founder entities that indicate withdrawal from the plan because of the bifurcated rates.

Moreover, the Court is not convinced that the SJVIA's decision to bifurcate rates was, as a matter of law, a superseding cause of the non-founder member exits. "An intervening cause which breaks the chain of causation from the original negligent act is itself regarded as the proximate cause of the injury and relieves the original negligent actor of liability." *Schrimsher v. Bryson*, 130 Cal.Rpt. 125, 127 (Cal. App. 1976) (citing 65 C.J.S. Negligence § 111(1); 2 Restatement of Torts 2d, § 440.) "The general test of whether an independent intervening act, which operates to produce an injury, breaks the chain of causation is the foreseeability of the act." *Id.* (citation omitted). "An act is not foreseeable and thus is a superseding cause of the injury 'if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen…" *Id.* (citing Witkin Summary of California Law (8th ed) Torts § 628 (citing cases)).

"Generally speaking, the determination of whether the intervening act is foreseeable is a question of fact unless under the undisputed facts there is no room for a reasonable difference of opinion." *Id.* (citing 2 Restatement of Torts 2d, § 453, comment b; Prosser, Law of Torts (4th ed.) § 45) (further citations omitted).

Here, assuming solely for purposes of this motion that GBS's conduct in recommending premium rates fell below the standard of care and caused damage, there remains an issue regarding whether the SJVIA's decision to bifurcate rates was foreseeable. The Court finds that there is "room for a reasonable difference of opinion" on this issue as well.[6] Thus, the Court declines to award summary judgment based on this argument.

## IV. CONCLUSION

For these reasons discussed herein, GBS's motion for summary judgment, or, alternatively, partial summary judgment (ECF No. 53.) is DENIED.

IT IS SO ORDERED.

Dated: **November 20, 2019**          /s/ Erica P. Grosjean
                                      UNITED STATES MAGISTRATE JUDGE

---

[6] The Court reaches this conclusion without considering Bednar's supplemental declaration. (ECF No. 57-4.) Thus, the Court does not decide whether the portions of Bednar's supplemental declaration should be stricken as expert opinions improperly disclosed after the close of discovery. *See Mariscal v. Graco*, 2014 WL 2919520 at *4 (N.D. Cal. June 26, 2014) (striking supplemental expert declaration that offered new opinions after the close of discovery).