| | |
|---|---|
| SAN JOAQUIN VALLEY INSURANCE AUTHORITY, <br><br>        Plaintiff, <br><br>    v. <br><br> GALLAGHER BENEFIT SERVICES, INC. <br><br>        Defendants. | Case No. 1:17-cv-00861-EPG <br><br> **ORDER**: <br><br> 1. DENYING DEFENDANT'S MOTION FOR PARTIAL EXCLUSION OF OPINIONS OF MR. WILLIAM BEDNAR; <br><br> 2. GRANTING PLAINTIFF'S MOTION FOR PARTIAL EXCLUSION OF OPINIONS OF MR. JIM TOOLE; <br><br> 3. GRANTING IN PART PLAINTIFF'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE ARGUMENT OR EVIDENCE CHARACTERIZING THE SJVIA AS A SINGLE ENTITY OR PASS THROUGH ENTITY; <br><br> 4. DENYING PLAINTIFF'S MOTION *IN LIMINE* NO. 2 TO EXCLUDE ARGUMENT OR EVIDENCE OF COLLATERAL SOURCE PAYMENTS; AND <br><br> 5. GRANTING DEFENDANT'S MOTION *IN LIMINE* NO. 1 THAT EVIDENCE OF PREMIUM SJVIA HAS CHARGED TO MAKE UP FOR ITS DEFICIT POSITION IS RELEVANT AND ADMISSIBLE; <br><br> 6. GRANTING PLAINTIFF'S MOTION FOR THE EXCLUSION OF MS. JENNIFER WALSH <br><br> (ECF Nos. 80, 82, 83, 84, 88) |

In this case, set for trial to begin on February 4, Plaintiff San Joaquin Valley Insurance Authority ("SJVIA") claims that Defendant Gallagher Benefit Service ("GBS") is liable for

professional negligence, negligent misrepresentation, and breach of contract related to the consulting services that GBS performed for SJVIA during the period of 2010 through 2016. Before the Court are a number of pre-trial motions regarding what evidence may be presented to the jury of SJVIA's damages or lack thereof. This Order addresses six motions, including the parties' Rule 702 motions, as well as motions *in limine* related to the conflation of SJVIA and its members and participating entities and the collateral source rule.

For the reasons described in this order, the Court will DENY Defendant, GBS's Rule 702 motion seeking the partial exclusion of William Bednar's opinions. (ECF No. 80.)

The Court GRANTS Plaintiff, SJVIA's Rule 702 motion to exclude Mr. Jim Toole's opinions regarding the SJVIA's damages or lack thereof. (ECF No. 82.)

The Court GRANTS IN PART SJVIA's motion *in limine* no.1 to exclude argument or evidence characterizing the SJVIA, its members, or the participating entities as a single entity or pass through entity. (ECF No. 88.)

The Court DENIES SJVIA's motion *in limine* no. 2 to exclude argument or evidence of collateral source payments. (ECF No. 88)

The Court GRANTS GBS's motion *in limine* no. 1 seeking an affirmative ruling that evidence of premium sJVIA has charged its members to make up for its deficit position is relevant and admissible. (ECF No. 84).

Finally, the Court GRANTS the SJVIA's motion to exclude the testimony of Ms. Jennifer Walsh. (ECF No. 83.)

## I.   LEGAL STANDARDS FOR EXPERT WITNESS TESTIMONY

Federal Rule of Evidence 702 governs the admissibility of expert evidence and provides, as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) The expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) The testimony is based on sufficient facts or data;

2

(c) The testimony is the product of reliable principles and methods; and

(d) The expert has reliably applied the principles and methods to the facts of the case.

Rule 702 allows admission of "scientific, technical or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), "require that the judge apply his gatekeeping role…to all forms of expert testimony, not just scientific testimony." *White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir. 2002).

The Ninth Circuit has interpreted Rule 702 to require that "[e]xpert testimony…be both relevant and reliable." *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001). Relevancy simply requires that "[t]he evidence…logically advance a material aspect of the party's case." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

In the expert witness context, reliability seeks to capture whether an expert's testimony has "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co.*, 526 U.S. at 149. The Court is concerned "not [with] the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "A court may conclude that there is simply too great an analytic gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Kumho Tire Co.*, 526 U.S. at 157 (citation omitted).

Regarding the principle that an expert's opinion be based upon sufficient facts, "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2000) (excluding expert testimony that "was not sufficiently founded on the facts" of the case). "The duty falls squarely upon the district court to 'act as a 'gatekeeper' to exclude [testimony] that

does not meet Federal Rule of Evidence 702's reliability standards.'" *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citation omitted).

## II.    RULE 702 MOTION FOR PARTIAL EXCLUSION OF MR. WILLIAM BEDNAR (ECF No. 80.)

Defendant GBS moves to exclude the opinions of Plaintiff SJVIA's damages expert, William Bednar, (ECF No. 80) on the following bases: (1) under the law and the parties' contracts, SJVIA may recover only actual losses rather than reserves; and (2) Bednar's damages calculation is inadmissible because he followed an unreliable methodology that ignored how his supposed "corrections" of GBS's work in any given year would have impacted decisions by the SJVIA Board on premiums to charge in later years.

### A.  Whether SJVIA's Damages Are Limited to Actual Losses

First, GBS argues that "[t]he Court should exclude SJVIA's damages expert's disclosed opinions that SJVIA suffered $36.594 million in damages that are disconnected from the far-lesser amount of SJVIA's actual funding shortfall." (ECF No. 80, at p. 5-6). GBS claims that any damages figures exceeding the amount of underfunding are irrelevant because both the parties' contract and pertinent case law limit damages to "actual damages."

GBS relies on California case law regarding professional negligence claims that hold that damages for such claims are limited to a party's "actual damages." *See Loube v. Loube*, 74 Cal.Rptr.2d 906, 909 (Cal. App. 1998) (holding in attorney negligence claim that "the trial court correctly determined that the proper measure of appellants' damages was the difference between the value of their claims against Klapper and Yick and the award of damages they actually received" based on the principle that "an award of damages that exceeds actual loss runs afoul of the basic principle that damages are awarded to compensate for loss incurred"). Additionally, GBS relies on the parties' contract, which provides "each party shall only be liable for actual damages incurred by the other party, and shall not be liable for any indirect, consequential, or punitive damages." 2015 Contract at § 10.B. Similarly, GBS also argues that Mr. Bednar should be precluded from testifying that that any "damages" accrued from plan years 2012, 2013, and 2014, "when the plan's unbroken net surplus plainly proves GBS's work created no shortfall or

deficit." (ECF no. 80, p. 1.)

In response, SJVIA counters that it should be entitled to all damages proximately caused by GBS's alleged malfeasance, and but for GBS's faulty recommendations, SJVIA would have collected higher premiums to cover expenses as well as reserves. That is, it is entitled to the damages necessary to put it in the position it would have been in but for GBS's alleged breach, which would include holding reserves above actual expenses for the relevant years.

Although not binding, this issue was analyzed extensively by the Court of Appeals of Maryland, in the case of *Milliman, Inc. v. Maryland State Retirement and Pension Sys.*, 421 Md. 130, 25 A.3d 988 (2011). *Milliman* concerned a claim that a defendant actuarial firm breached its contract to provide actuarial services to the State Retirement System. More specifically, the claim was that the defendant had understated the contributions required to fund three of the State's ten retirement and pension systems because of the actuary's misinterpretation of a particular data code. As GBS does here, the defendant in *Millman* argued that, even assuming liability, damages were inappropriate because the pension system met or exceeded statutory goals and therefore suffered no actual damage. The Maryland High Court rejected that argument in a thoroughly reasoned opinion, as follows:

> To address the second question, namely, how to measure damages caused by errors in actuarial recommendations related to pensions systems, we lack statutory guidance as well as precedent. As a result, we turn to analogous decisions from our sister states to seek assistance.
>
> In *Dardaganis v. Grace Capital Inc.,* 889 F.2d 1237 (2d Cir.1989), the Trustees of the Retirement Fund of the Fur Manufacturing Industry entered into an agreement with Grace Capital, Inc., in which Grace became investment manager of the assets of the retirement fund and promised to "manage the [Fund's] Account in strict conformity with the investment guidelines promulgated by the Trustees." *Id.* at 1239. Pursuant to the investment guidelines, Grace was prohibited from investing more than fifty percent of fund assets in common stocks. During an eight month period, however, Grace invested more than fifty percent of fund assets in common stock, exceeding the fifty percent ceiling each month by an average of fifteen percent. The Trustees refused to increase the ceiling above fifty percent, and Grace was fired when the common stock holdings increased to approximately eighty percent of the portfolio.

Thereafter, the Trustees brought suit, alleging that Grace had breached a fiduciary duty embodied in 29 U.S.C. § 1104(a)(1)(D), by failing to adhere to the common stock ceiling. The federal district court granted the Trustees' motion for partial summary judgment on the issue of liability, holding that Section 1104's requirement that fiduciaries abide by the plan documents together with the agreement's provision that Grace manage the fund "in strict conformity with the investment guidelines," required the court to conclude, as a matter of law, that "[a]ny violation of the terms of [the] [a]greement constitute[d] a breach of Grace Capital's fiduciary duty under § 1104(a)(1)(D) and create[d] liability to the Fund." *Dardaganis,* 889 F.2d at 1239. The district court awarded damages by comparing what the plan actually earned with what it would have earned had Grace invested only fifty percent of the fund's account in equities.

On appeal, Grace asserted that "even if [it] breached a duty, there were no 'losses' to the plan, because the sum of the Fund's assets and the cash withdrawn to meet Fund obligations increased during their tenure." *Dardaganis,* 889 F.2d at 1243. The Second Circuit Court of Appeals affirmed the trial court, reasoning that the Fund has suffered losses as a result of Grace's breach, and any award of damages should take into account the financial position the beneficiaries would have occupied, but for the breach:

[A]n "appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." [*Donovan v. Bierwirth,*] 754 F.2d [1049, 1056 (2d Cir.1985)]. If, but for the breach, the [f]und would have earned even more than it actually earned, there is a "loss" for which the breaching fiduciary is liable.

*Id.* at 1243. In *Dardaganis,* therefore, an investment manager was required to compensate a fund for losses stemming from a breach of the standard of care, no matter whether the fund's assets grew as a whole, to place the fund in the position it would have been in but for the breach.

We also find helpful to our analysis an unpublished opinion of the California intermediate appellate court, *Board of Trustees v. Mercer,* 2003 WL 21481021, 2003 Cal.App. Unpub. LEXIS 6236 (Cal.Ct.App.2003), in which the Board of Trustees for the San Luis Obispo County Pension Trust as well as the County of San Luis Obispo filed a claim against their former actuary, Mercer, for professional negligence. In the case, presenting factual circumstances remarkably similar to the present case, the trust paid a defined benefit and was funded by contributions from the county and its employees and income from the investment of trust assets. Mercer was the trust actuary from 1980 through 1996, when the actuary discovered errors in the computer program it used in preparing actuarial valuations for the trust, including an assumption that plan participants would have no surviving spouses. As a result, Mercer failed to account for the payment of survivors' benefits, such that "the trust's future liabilities were underestimated and its assets were overestimated." *Id.* at *1, 2003 Cal.App. Unpub. LEXIS 6236 at *3.

At trial, Mercer admitted breaching the actuarial standard of care, but disputed liability, because "in spite of its errors, the trust was fully funded" and therefore, "suffered no damages." *Id.* at *2–3, 2003 Cal.App. Unpub. LEXIS 6236 at *6–7. The trial judge determined that the trust suffered a loss of investment income on the nearly $11 million the county under-contributed to the fund. The appellate court affirmed, rejecting Mercer's contention that the award of lost interest would amount to "an impermissible windfall." *Id.* at *4, 2003 Cal.App. Unpub. LEXIS 6236 at *12. Instead, the court recognized that although the "county may derive an incidental benefit from Mercer's payment of damages to the trust, as will county employees and all taxpayers living within the county," awarding damages for lost investment income would place the county in the position it would have been in had Mercer properly valued the pension's assets and liabilities. *Mercer* suggests that whether a pension fund is fully funded is immaterial in calculating damages, when an actuary has miscalculated pension obligations.

In the present case, Milliman breached its contracts with the System by misinterpreting the "00" code over a period of twenty-two years, thereby causing the System to inadequately plan for the costs of retirement benefits to surviving spouses of judges and police officers. Milliman attempts to diminish its culpability for the errors because the System has met its funding goals, as in *Dardaganis* and *Mercer;* the reality is, however, that but for Milliman's miscalculations, the three affected systems would have been more robust. We agree with the Board that to accept Milliman's argument would enable a highly trained, skilled professional to escape liability on the basis of fortuitous economic changes and better than anticipated investment returns, rather than suffer the consequences of the breach of its standard of care

*Milliman, Inc. v. Maryland State Retirement and Pension System,* 421 Md. 130, 157–161 (2011).

The Court finds this reasoning persuasive. The appropriate measure of damages for a breach of professional negligence is the difference between what SJVIA actually earned and what it would have earned absent GBS's alleged negligence. Cal. Civ. Code § 3333 ("For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."); *see also Eckert Cold Storage, Inc. et al. v. Behl*, 943 F.Supp. 1230, 1234 (E.D. Cal. 1996) (noting that, in professional negligence action, the proper measure of damages were those sufficient to place plaintiffs in the position they would have occupied had the misrepresentations not occurred). Put another way, SJVIA is entitled to be returned to the position it would have been in had GBS properly fulfilled its professional and contractual duties. This may include additional reserves and general "robustness" if properly tied to GBS's misrepresentations.

7

The parties' contract supports this conclusion. Again, it provides that "each party shall only be liable for actual damages incurred by the other party, and shall not be liable for any indirect, consequential or punitive damages." 2015 Contract at § 10.B. Mr. Bednar opines that GBS's faulty representations caused damages in the form of uncollected premiums, which caused SJVIA to lack sufficient funds for expenses and reasonable reserves. Those damages are, in his opinion, direct consequences of GBS's misrepresentations. They are not indirect, consequential or punitive. Thus, they are not precluded by the parties' contract.

**B. Whether Bednar's Opinions Are Unreliable For Failing to Account for the Downstream Effects of the Corrections**

GBS next seeks to exclude the opinions of Mr. Bednar on the basis that "Bednar's damages calculation is inadmissible because he followed an unreliable methodology that ignored how his supposed 'corrections' of GBS's work in any given year would have impacted decisions by the SJVIA Board on premiums to charge in later years." (ECF No. 80, at p. 3). Specifically, GBS claims that "Bednar's report contains no analysis of how additional premium collected in one year would have affected the SJVIA's rate-setting decisions in later years," and "[u]nder Bednar's own assertions, SJVIA's financial position in 2013, and every later year, would have included the impact of millions of additional premium dollars from each previous year." (ECF No. 80, p. 8-9.)

SJVIA responds by claiming that Mr. Bednar's methodology properly accounts for downstream effects. SJVIA argues "Notably, Gallagher's own expert, Jim Toole, has not offered any opinions to support Gallagher's vague and blanket assertion that Bednar failed to account for alleged downstream effects. The reason is obvious: Bednar's opinions *do* account for downstream effects." (ECF No. 89, at p. 8).

The Court held a hearing on this motion, among others, on January 24, 2020. (ECF No. 99). This question was discussed at length. For the reasons described on the record at that hearing, the Court disagrees with GBS's assertion that Mr. Bednar failed to account for the downstream effects of his calculations. GBS failed to point to any such mathematical error in Mr. Bednar's opinion, in either its motion or during the hearing. Rather, it became clear at the

hearing that the disagreement about Mr. Bednar's opinion concerns the proper amount of "surplus reserves," and the related question of whether SJVIA's board would have decided to reduce premiums rather than continue to add to such reserves. Both parties presented evidence and argument to support their position on the appropriate amount of such reserves, and the Court takes no position on that question, which is properly one for the jury. However, this difference of opinion is not the same as a methodological or mathematical error justifying exclusion of Mr. Bednar's opinions under Rule 702.

The Court also finds that any failure to adequately account for SJVIA's Board's supposed reticence to increase premiums does not render the opinion inadmissible and is properly the subject of cross-examination at trial.

### III. PLAINTIFF'S RULE 702 MOTION TO EXCLUDE OPINIONS OF MR. JIM TOOLE (ECF No. 82.)

Next, SJVIA moves to exclude certain opinions of Mr. Jim Toole related to damages suffered by the SJVIA related to four opinions:[1]

- The damages to the SJVIA are $0.
- Purported damages are a matter of timing of premium contributions and do not arise from actual costs incurred by the plan.
- It is illogical to assess damages during the time that the plan had a positive net position.
- The calculation of the SJVIA's damages as excess premiums funding an increasing net position for the SJVIA is inappropriate.

(ECF No. 82, at p. 3).

All except the first opinion relate to the argument, analyzed above, that SJVIA's damages cannot exceed its expenses for any given year. Mr. Bednar gives the opinion that "[t]he calculation of damages as excess premiums funding an increasing net position for the SJVIA is inappropriate." (ECF No. 82-2, p. 5). *See also* ECF No. 82-2 at p. 30 ("A significant portion of

---

[1] SJVIA moves to exclude Mr. Toole from offering expert testimony only insofar is it relates to specific opinions articulated in paragraphs 11, 12, 13, 14D, 14E, and 14F of Mr. Toole's expert report. (ECF No. 82, at p. 3).

what Mr. Bednar considers as damages are excess premiums funding a positive net position over and above expected claims levels, which is inappropriate.").

This argument is the same as GBS's first challenge to Mr. Bednar's opinions, i.e., that SJVIA's damages should be limited to actual losses. But, for the same reasons described above, the Court finds as a matter of law that SJVIA may claim as damages any amounts that it would have collected *but for* GBS's misrepresentations. It is not limited to losses or claims, and may include surplus reserves to the extent supported by evidence and expert opinion. Thus, Mr. Toole's opinions based on the assumption that damages above actual claims are "inappropriate" do not fit with the law and should be excluded.[2]

The Court next turns to the portions of Mr. Toole's report supporting his opinion that damages to SJVIA are $0. Notably, Mr. Toole's opinion is not based on SJVIA's actual financial experience or ability to recoup its losses or not after 2016. Rather, Mr. Toole's opinion about the SJVIA suffering zero damages is based on his understanding that "it is the Participating Members who are at risk in the self-insured construct, not the health insurer, or the plan itself, which is effectively a pass-through, paying claims on behalf of Participating Members with funds contributed by Participating Members. The net position of the plan belongs to the Members, as opposed to the insurer" (ECF No. 29.)

SJVIA argues that Mr. Toole's opinions are based upon insufficient or incorrect facts, namely, that the SJVIA is a pass through entity that incurs no liabilities or debts of its own and can always make up for premium underfunding by going back to members to collect the shortfall and therefore cannot suffer damages. Relatedly, SJVIA also argues that Mr. Toole's damages opinions should be excluded because his "'faulty facts and assumptions result in faulty methodology and unreliable opinions." (ECF no. 82, p. 7.)

In response, GBS asserts that, pursuant to the foundational documents and general principles of a single risk pool, Mr. Toole's opinion is appropriate: it informs the jury that, in

---

[2] This ruling does not preclude Gallagher from introducing evidence that SJVIA would not have raised excess premiums but for Gallagher's alleged misrepresentations, for example because the SJVIA board would have decided to distribute any excess rather than keep that amount as reserves. However, Mr. Toole's report is not based on any evidence regarding what the Board should or would have done. It is based on a false legal assumption that excess premiums over claims levels are "inappropriate" and "make[] no sense." (ECF No. 82-2, at p. 30).

theory, SJVIA can never suffer monetary damages because any excess claims will always be refunded fully by its members.

This issue was also discussed extensively at the January 24, 2020 hearing. As described on the record, and further below, the Court believes that Mr. Toole's assumptions underlying this opinion are not supported by the factual record. It is not true that SJVIA's structure always allows it to pass along its liabilities to its members (or participating entities).[3] Whether GBS can present evidence regarding whether SJVIA in fact did recoup its losses is an evidentiary question addressed separately in this order. But as a matter of structure or logic, Mr. Toole's opinion that there will never be damages to SJVIA is inadequately supported.

Mr. Toole's opinion that SJVIA suffered $0 in damages is based on the assumption that SJVIA is a self-insured plan where the risk that premiums do not cover claims is always borne entirely by the members and not SJVIA:

> In a self-insured plan, Participating Members are not indifferent to the plan's financial outcome; plan performance directly impacts the current net position and future premium levels. The upside in the self-insured scenario is that with positive experience, positive net positions can be returned to the Members who funded the excess. However, if the plan is temporarily in a negative net position, Member contributions are required to return the plan to a desired net position.
>
> Simply put, it is the Participating Members who are at risk in the self-insured construct, not the health insurer, or the plan itself, which is effectively a pass-through, paying claims on behalf of Participating Members with funds contributed by Participating Members. The net position of the plan belongs to the Members, as opposed to the insurer.
> . . .
> In a self-insured arrangement, it is ultimately the Participating Members that fund that payment of their claims. Members pay premiums into a pool that is then used to fund the claims that the group incurs.
> . . .
> [W]hen the group has not contributed enough in premium to cover the costs of the claims it has incurred, the group will have to catch up.

---

[3] The Court uses the terms "Members" and "Participating Entities" inexactly. It is aware that these terms have precise meanings in the contracts and are not truly interchangeable. Indeed, SJVIA contends that Mr. Toole in particular failed to appreciate the distinction between them. While the Court has tried to be precise, it likely has failed to use the correct terminology at all times. The Court does not believe that the difference between these terms affects any of the legal issues before it in this order.

In either instance, aggregate inception-to-date premium contributed to the fund will be the same to Participating Members, with the difference being merely the timing of contributions. Funding a self-insured pool is largely a matter of timing, with participants paying more (less) in early periods and less (more) in later periods. Under either scenario, costs are unchanged and the group ultimately funds the full amount of its own claims.

In other words, there are no damages to the SJVIA, but rather it is in a temporary negative net position that will be corrected by increased participant contributions, as is usual and appropriate for any self-insured pool.

(ECF No. 82-2, at p. 29).

As an initial matter, Mr. Toole does not cite any contractual provisions in support of his argument. His opinion appears to be solely based on his understanding that SJVIA is a "self-insured plan" and that "The net position of the plan belongs to the Members, as opposed to the insurer." This lack of any contractual support within his own opinion casts doubt on the sufficiency of a basis for this critical opinion.

In its motion, SJVIA points to contractual provisions that it contends run contrary to Mr. Toole's assumptions. First and foremost, Article 4 of the Joint Powers Agreement ("JPA") creating the SJVIA provides that: "The debts, liabilities and obligations of the Authority shall be the debts, liabilities or obligations of the Authority alone, except as provided in Article 15 of this Agreement [regarding termination], and shall not constitute debts, liabilities, or obligations of any party to this Agreement notwithstanding the payment of respective costs identified in Article 2." (ECF No. 81-4, p. 6.) This provision contradicts Mr. Toole's assumption that the "net position of the plan belongs to the Members."

SJVIA also contends that members are only liable for their premiums each year. If the claims exceed the premiums as a pool, there is no contractual obligation for the members to pay the excess amount. The members may choose to leave the pool without paying any additional amounts. However, if any member chooses to renew its participation in the pool, its premiums may be raised in part or in full to make up for any past shortfall. SJVIA contends that Mr. Toole failed to understand this, and includes the following deposition testimony in its motion:

> Q. Do you understand that if a new member comes into the plan, they're only
> charged the rates that are set by Gallagher, and they have no responsibility to pay

anything more different if their claims exceed the rates and premiums that they pay?

A. I'm not familiar with that contracting structure.

Q. How about, are you familiar with the participation agreements with the participating entities?

A. So this is another example of how every pool operates everything differently. So I'm not -- I'm not familiar with -- I did not see those contracts.

. . .

Q. I'll ask it again just to make sure, but. Did you understand that by paying the premium and coming into the SJVIA, that the group only paid the rates, the proposed rates that they were given. And if their premiums exceeded -- I'm sorry. If their claims exceeded the premiums that they paid, they would not have to pay anymore?

MR. WATNICK: Ever?

A.    I didn't understand.

(ECF No. 82, at p. 6).

During oral argument, counsel for GBS pointed to multiple provisions in the contract that they claimed supported Mr. Toole's assumptions, even though Mr. Toole himself did not refer to them in his report.  Article 2 of the JPA provides that: "This Agreement is entered into by the Parties so that the Authority shall jointly develop and obtain pooled self-funded or purchased Insurance Programs and related administrative services as selected by the Authority, in all instances subject to a financial commitment by the participating Entity to pay for its respective costs of the Insurance Program as provided in this Agreement."  While some of this language is quite compelling, it appears to be a commitment to develop further contracts (i.e., "shall jointly develop").  Moreover, the provision quoted in Article 4 makes clear that SJVIA's debts belong to SJVIA alone, notwithstanding this provision.  Article 4 of the Joint Powers Agreement ("JPA") ("The debts, liabilities and obligations of the Authority shall be the debts, liabilities or obligations of the Authority alone, except as provided in Article 15 of this Agreement [regarding termination], and shall not constitute debts, liabilities, or obligations of any party to this Agreement notwithstanding the payment of respective costs identified in Article 2.").

Counsel for GBS also pointed to Article 15 of the JPA, which provides that: "Upon termination of this Agreement, all assets and debts of the Authority in each Insurance program shall be distributed among the Parties and Participating Entities that are not also parties in proportion to their cash contribution, including premiums paid and property contributed (at

13

market value when contributed)." (*Id.* at p. 12.) However, SJVIA did not terminate or intend to terminate during this time. The fact that SJVIA could have chosen to distribute its assets and debts by terminating altogether does not mean that SJVIA in fact suffered no damages.

Further, participating entities signed Participation Agreements that provided "Subsequent renewals are based on the SJVIA underwriting guidelines." The SJVIA underwriting guidelines in turn provide that (a) "[t]he claims experience of all member entities is pooled and risk is shared among all members;" and (b) participants "will receive annual renewal increase[s] based on the collective experience of the SJVIA program." (ECF No. 87-37, p. 1.) But these provisions merely state that those participants who choose to renew would have their premiums adjusted to reflect the collective experience of SJVIA. These provisions—none of which were cited by Mr. Toole—fall short of supporting Mr. Toole's conclusion that "it is the Participating Members who are at risk in the self-insured construct, not the health insurer, or the plan itself, which is effectively a pass-through." No provision clearly and explicitly requires members or participating entities to pay all of SJVIA's liabilities to the extent they excess SJVIA's assets. No provision says, absent termination, that SJVIA can seek any overrun from its members. No provision says that the expenses are passed through to SJVIA's members.

Instead, the contracts appear to allow SJVIA to raise premiums for renewing members in future years to make up for past claims experience. This distinction between current and future/renewing members is not addressed in Mr. Toole's report. As discussed extensively at the hearing, this is a critical distinction. Some members may choose not to renew, and thus never pay for the additional claims. SJVIA could choose not to raise premiums on renewing members to the full extent of past claims. Remaining members could be bankrupt or otherwise be unable to pay excess liabilities even upon termination. In other words, SJVIA's actual composition and contractual rights mean that it is theoretically possible for SJVIA to incur liabilities that do not pass through to its members.

Thus, Mr. Toole's opinion that damages are $0 because SJVIA "is effectively a pass-through" is incorrect and unsupported. Accordingly, Mr. Toole's opinions on this subject are excluded under Federal Rule of Evidence 702. See, e.g, *Brooke Group Ltd.* 509 U.S. at 242

14

("[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2000) (excluding expert testimony that "was not sufficiently founded on the facts" of the case); Fed. R. Evid. 702 (requiring expert opinions to be based upon "sufficient facts or data" and reliable methodology).

IV.    **PLAINTIFF'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE ARGUMENT OR EVIDENCE CHARACTERIZING THE SJVIA AS A PASS THROUGH ENTITY (ECF NO. 88)**

In its motion *in limine* number 1, Plaintiff SJVIA "seeks an order barring GBS [GBS], including its counsel and witnesses, from presenting any evidence or argument that characterizes the SJVIA, its founding members, or the participating entities as a single or pass through entity." (ECF No. 88, at p. 5).

In support, Plaintiff relies on the Court's pretrial order, which states (based on the submission of the parties) that the following are undisputed facts:

> 2. The SJVIA is a separate legal entity, formed pursuant to California Government Code section 6500, is registered with the California Secretary of State, and has independent legal rights, including the ability to enter into contracts, hold property, and sue or be sued.
>
> . . .
> 4.    The debts, liabilities, and obligations of the SJVIA belong to the SJVIA and not the Counties of Fresno or Tulare, or any other participating entity.

(ECF No. 74, at p. 3).

In response, GBS points to the same contractual provisions discussed above in connection with Mr. Toole's opinion.  It summarizes the arrangement as follows: "By looking to the pool's prior experience as the basis for setting renewal premiums, this arrangement necessarily contemplated that current Participating Entities would pay premiums determined in part by prior bad (or good) experience of the pool, including any prior bad (or good) experience of entities who left the pool."  (ECF No. 93).

GBS goes on to argue: "That is what is happening now, and what SJVIA wants to keep

15

away from the jury.  SJVIA is collecting participant contributions to restore its net position."
(ECF No. 93, at p. 6)

Finally, GBS argues that, if the program shut down entirely, "all assets and debts of the Authority in each Insurance Program shall be distributed among the Parties and Participating Entities that are not also parties in proportion to their cash contributions, including premiums paid and property contributed . . . ."  (ECF No. 6, at p. 18).

Upon consideration, this Court finds that this motion touches upon various interrelated issues, which must be addressed independently.

SJVIA's motion to exclude any reference to SJVIA as a "pass-through" entity, and to prohibit GBS from conflating SJVIA with its members and participating entities is GRANTED. GBS cites no contractual provision deeming SJVIA a pass through entity.    On the contrary, the contracts, and the Court's pretrial order, hold that SJVIA is a separate legal entity.  SJVIA and SJVIA alone is liable for its liabilities.  Only SJVIA is a Plaintiff in this case.  The members and participating entities are not Plaintiffs.  Moreover, there is no basis to assert that the debts and liabilities of SJVIA automatically pass to its members or participating entities.  Although the Court appreciates that certain terms in the contract are unclear, the parties appear to agree that, absent termination, participating entities are only liable for their premiums to the extent they continue to participate, although such premiums may be raised in the future to account for past claim experience.  GBS may not suggest anything to the contrary.

Relatedly, GBS is prohibited from referring to the contractual provisions regarding termination.  SJVIA did not terminate.  GBS has presented no evidence it ever considered terminating.  There is no question before the jury concerning what would happen at termination. To evaluate such an event risks confusing the jury, without assisting it in deciding any issues before it.

However, to the extent SJVIA seeks to preclude GBS from introducing evidence regarding its financial condition after GBS ceased working for SJVIA, that request is DENIED. GBS may present evidence about what actually did happen after GBS finished its consulting role, including which members or participating entities remained, what premiums were paid, what

16

claims were paid, the amount of reserves, etc. As discussed more below in connection with the motions *in limine* addressing the collateral source rule, to the extent that SJVIA raised premiums to account for prior losses, or otherwise recovered from the alleged damages attributed to GBS, the jury may hear and evaluate such evidence.

**V.     CROSS MOTIONS *IN LIMINE* REGARDING THE COLLATERAL SOURCE RULE. (ECF NO. 84, MOTION *IN LIMINE* 1; ECF NO. 88, MOTION *IN LIMINE* 2)**

The parties have filed cross motions *in limine* regarding whether the jury may hear evidence regarding SJVIA's efforts to recover from any shortfall following GBS' representation of SJVIA. For its part, GBS "seeks an affirmative ruling that evidence of the SJVIA's current recovery of the alleged shortfall of premiums is admissible." (ECF No. 84, p. 9.) SJVIA, in contrast, moves "to exclude argument or evidence of collateral source payments," seeing an order "barring GBS from presenting any evidence or argument that the SJVIA has received loans, payments from its founding members, or premiums from its participating entities after December 31, 2016, that offset damages." (ECF No. 88, p. 11.)

**A. The Collateral Source Rule**

SJVIA's sole legal argument for excluding evidence of its financial condition, including premiums received, after December 31, 2016 is that such evidence is barred by California's "collateral source rule."

Under California law, a plaintiff is normally "entitled to no more than a single recovery for each distinct item of compensable damages supported by the evidence," "[r]egardless of the nature and number of legal theories advanced by the plaintiff." *Tavaglione v. Billings*, 847 P.2d 574, 580 (Cal. 1993) (citation omitted). Thus, "[d]ouble or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited." *Id.*

The "collateral source rule," is an exception to the prohibition against double recovery, providing that "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." *Helfend v. S. Cal. Rapid Transit*

*Dist.*, 465 P.2d 61, 63 (Cal. 1970).

The California Supreme Court examined the origins and purposes of the collateral source rule in detail in *Helfend*. The plaintiff in that case was injured in an automobile collision. The plaintiff sued the tortfeasor and claimed damages including his medical expenses. The tortfeasor intended to introduce evidence showing that the plaintiff's medical insurance carrier paid about 80% of the plaintiff's medical bills and that other insurance carriers paid for the rest. The California Supreme Court held that the collateral source rule applied to prevent any offset of the plaintiff's damages that the plaintiff received through his insurance carriers. The Court reasoned that the plaintiff "received benefits from his medical insurance coverage only because he had long paid premiums to obtain them." *Id.* The Court continued that the application of the collateral source rule under the facts "embod[ied] the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift." *Id.* This prevented the tortfeasor from "garner[ing] the benefits of his victim's providence." *Id.*

The *Helfend* court set forth the public policy considerations favoring the collateral source rule:

> The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance.

*Id.* at 66-67.

In light of those considerations, the *Helfend* court reaffirmed California's "adherence to the collateral source rule in tort cases in which the plaintiff has been compensated by an independent source—such as insurance, pension, continued wages, or disability payments—for which he had actually or constructively…paid or in cases in which the collateral source would be recompensated from the tort recovery through subrogation, refund of benefits, or some other arrangement." *Id.* at 69.

The Court has carefully considered whether SJVIA's collection of premiums after 2016

18

fall within California's definition of a collateral source. As an initial matter, this is not a case involving an insurance payment, as in *Helfend*. It also does not involve any of the categories set forth in *Helfend*—it does not involve pension, continued wages, or disability payments. It also does not involve any entity that SJVIA actually or constructively paid in order to recover in the event of a tort. The Court has also considered whether the "collateral source would be recompensated from the tort recovery through subrogation, refund of benefits or some other arrangement." There is no evidence of any explicit agreement to subrogate or refund benefits. Based on the Court's understanding of SJVIA's relationship to its members, it appears possible that a recovery in this case would ultimately be returned to the members who paid heightened premiums. However, this is an analogy at best. In any event, SJVIA has not made this argument or given the Court any evidence to reach such a conclusion. Thus, the Court finds that SJVIA's collection of additional premiums after 2016 does not fit within any of the categories described by the California Supreme Court as qualifying for the collateral source rule.

The Court next looks to see if California courts have extended the collateral source rule beyond these categories to a situation like this one. Neither party presents any California authority applying or refusing to apply the collateral source rule to a similar case, i.e., professional negligence by a financial consulting firm. Where no California court has extended the collateral source rule to such a situation, this Court is hesitant to find that it would do so here.

The case most closely analogous to the present one is *Milliman, Inc. v. Maryland State Retirement and Pension System*, 25 A.3d 988, 421 Md. 130 (Md. 2011), which was discussed extensively above in the context of whether damages should be limited to actual losses. In that Maryland case, payments to the pension system from the state were excluded from damages because they were "from a collateral source," with reasoning that arguably applies to the present situation:

> The Board determined that the sum "needed to make [the System] whole from the losses sustained as a result of Milliman's errors," included approximately $34 million in deficient contributions plus $38.8 million in lost interest on those contributions during the twenty-two year period:
> . . .

In so doing, the Board rejected Milliman's argument that the System was not damaged insofar as the taxpayers would fund any deficiency, because that "perspective subvert[ed] the entire function and purpose of actuarial analysis":

An additional one of Milliman's alternative arguments against the award of any damages in the face of a determination of breach and liability is that MSRPS is not harmed, because, notwithstanding 22 years of Milliman's actuarial errors, it is undisputed that ultimately the retirement and pension systems will be fully funded in accordance with law. . . .

However, this perspective subverts the entire function and purpose of actuarial analysis, which is to determine how much to contribute and when. If the Board were to accept this argument, an actuary could satisfy its contractual obligations to a client by training a monkey to punch random keys on a calculator. MSRPS, the Governor, and Legislature could agree to appropriate the amount thus randomly determined to be allocated toward pension funding, with the understanding that some group of State taxpayers sometime in the future would make up the difference in the event of a deficit or reap the rewards in the event of a surplus, and the actuary would always be held harmless for any calculation error, no matter its basis or magnitude.

Certainly, this is not an acceptable standard of professionalism for actuaries, nor is it the one in force, nor would its adoption benefit any actuarial firm, nor does such a lax standard characterize the usual excellent work of the competent, impressive, highly trained, skilled, and careful actuarial experts engaged by Milliman. Instead, the approval of such an argument would render actuarial calculations pointless. Adopting this position would also undermine the extremely important statutory objectives of leveling contributions, protecting inter-generational equity, and pre-funding defined benefits. That the losses incurred by MSRPS have now been amortized and already partially restored is irrelevant to Milliman's responsibility because the reimbursement made to date is from a collateral source, namely budgets adopted in years subsequent to the years and in different amounts than the appropriations that should have been made and would have been made but for Milliman's error.

*Milliman, Inc. v. Maryland State Retirement and Pension System*, 421 Md. 130, 146–147 (2011).

This reasoning in *Millman* gives the Court significant pause. As in *Millman*, GBS argues, at least for purposes of this motion, that no matter how faulty or negligent its advice to SJVIA, it is not liable for damages so long as SJVIA eventually recovers its shortfall from renewing members. Like in *Millman*, this recovery will likely come from taxpayers as the members are public entities. Indeed, GBS has taken the position, described above in connection with the expert report of Mr. Toole, that damages must always be $0 because there is always an opportunity to seek additional premiums in the future. The Court is indeed concerned that

allowing GBS to rely on such later payments to reduce or eliminate damages "subverts the entire function and purpose of actuarial analysis, which is to determine how much to contribute and when." From a policy perspective, the Court understands why the *Millman* court excluded such tax payer funded reimbursement from damages.

However, *Millman* was not applying California law. Moreover, its legal grounding in the collateral source rule is limited to saying "the reimbursement made to date is from a collateral source" without any citation to authority. It does not even attempt to fit the reimbursement into any of the categories described by *Helfend*.

Additionally, the policy reasons set forth in *Millman*, albeit persuasive, are not the same policy reasons described by *Helfend* as underlying California's collateral source rule. *Millman* eloquently explains why inclusion of the taxpayer reimbursements "subverts the entire function and purpose of actuarial analysis." But this Court has not found in *Helfend* or any other California authority a direction to examine whether application of the collateral source rule is necessary to support the function of actuarial analysis, or even more generally to ensure that professionals adequately pay for work done negligently. Again, *Helfend* describes a different purpose behind California's collateral source rule:

> The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. . . . If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit.

*Helfend*, 465 P.2d at 66. That policy concern is not at issue here. SJVIA did not buy insurance, or otherwise pay in advance to any third party for protection in the event of this eventuality. In other words, the seemingly valid policy concern expressed in *Millman* is not one endorsed by California courts applying the collateral source rule. Given that the collateral source rule is a state common law exception to the general rule against double recovery, the Court is reluctant to extend such a rule into this new area. After all, on this issue, this Court seeks only to predict what California courts would do in an area of California law.

On the question of how broadly to construe the collateral source rule, the Court has looked

at the case of *Eastern Shore Title Co. v. Ochse*, 453 Md. 303 (2017), which is coincidentally also from the Court of Appeals in Maryland. In that case, the trial court had reduced damages of attorneys' fees in the amount satisfied through another litigation. The Maryland Court of Appeals affirmed, agreeing that the collateral course rule did not apply. While the facts of that case are quite different, the question of whether to limit the collateral source rule to specific categories rather than expand it to satisfy policy concerns also faces this Court. In that case, as in this one, Plaintiff made a persuasive argument why application of the collateral source rule was necessary to ensure that the tortfeasor adequately paid for its tortious conduct. While acknowledging the validity of this policy argument, the Court in *Ochse* ultimately rejected the application of the collateral source rule because it found Maryland courts only applied the rule to limited categories, inapplicable here, stating:

> The Ochses contend that the collateral source rule should apply to this case. However, they do not cite any authority for the proposition that a fee-shifting provision in a real estate sales contract is analogous to the collateral benefits listed in the Restatement. Furthermore, the circumstances of this case are distinct from the insurance context, where application of the collateral source rule normally prevents a defendant from receiving the benefit of a plaintiff's insurance for which the plaintiff paid consideration through premiums. In this case, application of the collateral source rule would be inappropriate because the Ochses did not pay separate consideration for the fee-shifting provision in their Contract of Sale with the Henrys.
>
> . . .
>
> We hold that the trial court properly declined to apply the collateral source rule in this case, and did not err by reducing the damages awarded to the Ochses by the amount previously satisfied by the Henrys. The Henrys' satisfaction of the attorney's fees from the Henry litigation eliminated the Ochses' injury, because the fees were not "incurred necessarily." Accordingly, the Ochses are unable to establish one of the basic elements of a negligence cause of action: "that the plaintiff suffered actual injury or loss."

*Eastern Shore Title Company v.* Ochse*, 453 Md. 303, 342–344 (2017).

So too, this Court holds that GBS may introduce evidence of premiums collected after the date of GBS consultation, and that such payments are not barred by the collateral source rule under California law.[4] Accordingly, the Court will GRANT GBS's motion *in limine* (ECF No.

---

[4] The Court is not holding that GBS will be able to prove that no damages result once this evidence is considered. As described above in connection with Mr. Toole's opinion, it does not find that this conclusion necessarily follows

22

84, motion *in limine* 1)and issue an affirmative ruling that evidence of the SJVIA's current recovery of the alleged shortfall of premiums is admissible. The Court will simultaneously DENY the SJVIA's cross motion *in limine* on this issue. (ECF No. 88, motion *in limine* 2).

## VI.    PLAINTIFF'S MOTION TO PRECLUDE THE TESTIMONY OF MS. JENNIFER WALSH (ECF No. 85.)

Plaintiff SJVIA moves to exclude the expert testimony of Jennifer Walsh on the grounds that "(1) she fails to articulate a standard of care; (2) her methodology for deriving a standard of care is completely subjective and unreliable; and (3) her methodology for evaluating a breach of the standard of care is completely subjective and unreliable." (ECF No. 83, at p. 2). Ms. Walsh explains in her expert report that she was "retained by Gallagher Benefit Services, Inc. (GBS) to assess whether they used reasonable care, diligence and judgement during their engagement with the San Joaquin Valley Insurance Authority (SJVIA) as their insurance broker & consultant." (ECF No. 83-2, at p. 2). She explained her evaluation of the proper standard of care in her deposition as follows:

> For me the standard of care is do I know my client, do I know what my client's trying to accomplish, do I have a reasonable amount of experience and understand what's going on in the industry and similarly situated clients and anticipating your question, you know, that, you know, it – you know it if it's not – I would know it if it wasn't reasonable. If someone had two years of experience only or had never actually met the client and was trying to make a recommendation. In this case it seems more than reasonable when someone knows the client is interacting, knows the other priorities the client has and is bringing to them their options and helping them weigh those, that's what I consider standard of care.

(ECF No. 83, at p. 5). Moreover, Ms. Walsh did not review the accuracy of any of GBS's financial assumptions or advice at issue in this case, but rather *assumed* that they were accurate. She explains in her report "While I reviewed financial exhibits in the context of timing, stakeholders and key decisions relevant to this matter, I did not review specific numbers in each document identified in Appendix B. I have made the assumption that the enrollment counts, paid claims, premium due, carrier renewals, etc. are accurate." (ECF No. 83-2, at p. 7). *See also* ECF

---

from the structure of SJVIA. Moreover, it appears to be a question of fact what shortfalls were recovered, when, and from whom, and how this evidence fits into the parties' damages analyses. The Court is only holding that evidence of SJVIA's financial condition after 2016 may properly presented to and considered by the jury.

No. 83-2, at p. 6 ("**Q:** So you can't specifically look at one rate renewal and say they made so any mistakes in this, it fell below the standard of care.  **A:** I would just be making up a number, some percentage or something. I don't know. I don't want to venture to guess."); ECF No. 83-2, at p. 5 ("I have not been retained to offer opinions as a financial modeling expert such as a claims analyst, consultant, underwriter, or actuary.  I am an expert in national common practices for employee benefit brokerage firms leveraging reasonable tools at the appropriate times for their clients.").

Defendant GBS opposes the motion on the ground that opinions such as Ms. Walsh's should be evaluated solely based on the expert's experience, training, and education, rather than the expert's methodology.  GBS also states that Ms. Walsh did apply objective standards.

The Court first addresses GBS's legal argument that "Under controlling authority not cited in SJVIA's motion, [Ms. Walsh's] credentials and experience constitute a sufficient basis for the Court to hold that her opinions are based on a reliable methodology."  (ECF No. 85, at p. 4).  The Court first looks to the language in Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The text of the rule does not support GBS's position that Ms. Walsh's credentials and experience entitle her to provide an expert opinion, without regard to the sufficiency of the underlying data, principles and methods.  Nor is Rule 702 limited to scientific opinions.

The Supreme Court has also provided the following relevant guidance:

> We conclude that *Daubert's* general holding—setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized"

24

knowledge. See Fed. Rule Evid. 702. We also conclude that a trial
court *may* consider one or more of the more specific factors
that *Daubert* mentioned when doing so will help determine that testimony's
reliability. But, as the Court stated in *Daubert,* the test of reliability is "flexible,"
and *Daubert's* list of specific factors neither necessarily nor exclusively applies to
all experts or in every case. Rather, the law grants a district court the same broad
latitude when it decides *how* to determine reliability as it enjoys in respect to its
ultimate reliability determination.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141–142 (1999). The Ninth Circuit has

similarly explained the trial judge's gatekeeping rule as follows:

Thus *Daubert* and *Kumho Tire* did indeed require that the judge apply his
gatekeeping role under *Daubert* to all forms of expert testimony, not just scientific
testimony. The Rule 702 inquiry under *Daubert,* however, "is a flexible one," and
the "factors identified in *Daubert* may or may not be pertinent in assessing
reliability, depending on the nature of the issue, the expert's particular expertise,
and the subject of his testimony." We are required to apply an abuse of discretion
standard to review of a district court's decision, "as much to the trial court's
decisions about how to determine reliability as to its ultimate conclusion."

*White v. Ford Motor Co.,* 312 F.3d 998, 1007 (9th Cir. 2002), *opinion amended on denial of*

*reh'g* (9th Cir. 2003) 335 F.3d 833 (footnotes omitted).

Finally, GBS relies on the Ninth Circuit's decision in *Hangarter v. Provident Life & Acc.*

*Ins. Co.*, which upheld the trial court's admission of expert testimony, stating "Given that, unlike

scientific or technical testimony, the reliability of Caliri's testimony was not contingent upon a

particular methodology or technical framework, the district court did not abuse its discretion in

finding Caliri's testimony reliable based on his knowledge and experience. We thus conclude that

the district court's inquiry was sufficient to comply with its gatekeeping role . . . ." *Hangarter v.*

*Provident Life and Acc. Ins. Co.* 373 F.3d 998, 1018 (9th Cir. 2004). The expert in that case

testified "about claims adjustment standards in the context of an insurance bad faith claim." *Id.* at

1015-16. That expert specifically testified that "when an insurer uses the same IME on a

continual basis, the medical examiner becomes biased because they lose their independence." *Id.*

at 1011 (internal quotations omitted).

Upon review of this case law, the Court concludes that it must fulfill its gatekeeping role

regarding Ms. Walsh's testimony and ensure that it complies with Federal Rule of Evidence 702.

How the Court fulfills that role in this case, which does not concern scientific testimony, is a

flexible one within its discretion. The Court is given latitude in deciding how to determine reliability and in making an ultimate reliability determination. However, the Court must ultimately determine that Ms. Walsh's opinion is based on sufficient facts or data, is the product of reliable principles and methods, and reliably applies those principles and methods to those facts and data.

The Court has carefully reviewed the expert report of Ms. Walsh. It has also conducted a thorough hearing with counsel for all parties regarding the reliability of that opinion. It has applied the test as outlined in Rule 702 as informed by the legal principles described above. The Court concludes that Ms. Walsh's opinion is not admissible under Federal Rule of Evidence 702.

In its opposition, GBS defends the reliability of Ms. Walsh's expert opinion as follows:

> Ms. Walsh's report and testimony *do* articulate objective standards of care that are grounded in her relevant knowledge and experience. At her deposition, for example, Ms. Walsh articulated the following industry standard of care regarding knowledge of the client's goals: "[I]t seems more than reasonable when someone knows the client is interacting, knows the other priorities the client has and is bringing to them their options and helping them weigh those, that's what I consider the standard of care." (*Id.* at 66:16–20.) In other words, a consultant is reasonable if they know their client's goals, communicate strategies related to those goals, and help the client weigh those goals in making its own decision. Ms. Walsh then applies that standard to the conduct at issue in the case. (*See, e.g.*, *id.* at 57:15–58:12; 62:3–63:16; 158:21–159:15; 168:23–169:9.)

(ECF No. 85, at p. 6).

As an initial matter, this standard of care is not articulated in Ms. Walsh's expert report. It is not supported by any citations to literature. It is not tied to any provision in the contract. It is not supported by any actuarial or industry guidelines. It is not relied on by any other court or expert. Indeed, GBS makes no attempt to justify this as a reasonable standard of care besides defending Ms. Walsh's own experience.

On its face, the standard does not appear to be a reliable test for the standard of care at issue in this case. SJVIA's complaint alleges:

> SJVIA retained GBS to provide expert consulting, actuarial services, client service, financial analysis, financial monitoring, financial reporting, actuarial modeling, rate setting, and other services to SJVIA in order to manage its success. . . . GBS made fundamental errors in its methodology, assumptions, and

calculations related to SJVIA. For example: GBS failed to provide the services it agreed to in the 2010 and 2015 Consulting Agreements; GBS failed to obtain an actuarial certification of Incurred but not Reported ("IBNR") reserves each year as required for a plan this size; GBS failed to review reserve levels when completing renewal underwriting and failed to report on reserve erosion; GBS failed to adjust for IBNR each renewal year; GBS failed to provide reporting and monitoring to SJVIA on the performance of the program including failing to true up data; GBS failed to appropriately set rates for new participating entities and failed to appropriately consider their demographics and census data; and GBS set rates without considering internal trend and without an understanding of SJVIA's cash flow position.

(ECF No. 1-1, at p. 19-20). Ms. Walsh does not give any expert opinion regarding these critical allegations. She did not evaluate GBS's methodology, assumptions, and calculations related to SJVIA. On the contrary, she assumed that "the enrollment counts, paid claims, premium due, carrier renewals, etc. are accurate." (ECF No. 83-2, at p. 7). Thus, the methodology that Ms. Walsh used to determine that GBS "used reasonable care, diligence and judgment during their engagement" with SJVIA does not call into question any of the factual allegations underlying SJVIA's claims as to how GBS breached its standard of care. Nor does the Court believe that a consultant who "know their client's goals, communicate[s] strategies related to those goals, and help[s] the client weigh those goals in making its own decision," can reasonably be said to fulfill their standard of care, notwithstanding "fundamental errors in its methodology, assumptions, and calculations related to SJVIA."

This mismatch between what SJVIA has alleged GBS has done and what Ms. Walsh analyzes appears throughout Ms. Walsh's report. Ms. Walsh repeatedly identifies various problems that did not occur here, for example:

- In my experience, disconnects often occur when there is a lot of turnover between the consulting or client teams, or both. That is not the case in this matter. (ECF No. 83-2, at p. 7)

- Another contributing factor to issues is when there is no role clarity between the broker and client and/or inexperienced personnel are left to make decisions for which they couldn't reasonably be expected to advise (consultant side) or interpret and act upon (client side). That is not the case in this matter. (ECF No. 83-2, at p. 7).

- Background on the initial formation of the SJVIA is clearly outlined in the Gallagher Benefit Services—Summary of Activity (through January 2013) [Exhibit 76]. I've not seen any evidence that casts doubt on this document. (ECF No. 83-2, at p. 8)

- Another potential problem is when the client's specific requests are declined or ignored. That is not the case in this matter. (ECF No. 83-2, at p. 10.)

- I am satisfied that technical and actuarial resources were not withheld for financial reasons either personally or for overall office profitability. (ECF No. 83-2, at p. 10).

Ms. Walsh then concludes that because she did not see evidence of these problems, GBS fulfilled its standard of care. However, none of these issues underlie SJVIA's claims in this matter. SJVIA's claims against GBS are not based on allegations that GBS ignored specific client requests or withheld actuarial resources for financial reasons. Thus, her testimony that she found no evidence of such problems does not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Nor can Ms. Walsh credibly claim that the absence of such errors logically means that GBS did not commit the other errors actually at issue in this lawsuit.

Put another way, without examining the basis of the representations at issue in this lawsuit, i.e., the methodology, assumptions, and calculations related to SJVIA, Ms. Walsh's testimony is not based on sufficient facts or data. More troubling, to the extent Ms. Walsh assumed the accuracy of such calculations, her testimony is highly misleading to the jury. If she testifies that GBS fulfilled its standard of care as to the critical questions before the jury, the jury will likely believe that she reviewed the data behind GBS's representations, rather than just assumed them to be true.

Thus, after a careful consideration of Ms. Walsh's opinions, with the benefit of the parties' motion papers and oral argument, and based on Federal Rule of Evidence 702 as guided by the caselaw cited above, the Court finds that Ms. Walsh's expert testimony will not help the trier of fact to understand the evidence or to determine a fact in issue, is not based on sufficient facts or data, and is not the product of reliable principles and methods and is therefore EXCLUDED.

## VII. CONCLUSION

For the reasons set forth herein, IT IS HEREBY ORDERED that:

1. GBS's Motion for the Partial Exclusion of the Opinions of Mr. William Bednar (ECF No. 80) is DENIED;

2. The SJVIA's "Motion to Preclude Expert Testimony of Jim Toole" (ECF No. 82) is GRANTED;

3. The SJVIA's Motion *in limine* 1 (ECF No. 88) is GRANTED IN PART. GBS is prohibited from making any reference to the SJVIA as a "pass-through" entity or conflating the SJVIA with its members and participating entities. Likewise, GBS is prohibiting from referring to the contractual provisions regarding termination. To the extent the SJVIA seeks to preclude GBS from introducing evidence regarding its financial condition after GBS ceased working for the SJVIA, the motion is DENIED;

4. GBS's Motion *in Limine* 1 is GRANTED (ECF No. 84) and evidence of the SJVIA's current recovery of the alleged shortfall of premiums is admissible;

5. The SJVIA's Motion *in Limine* 2 (ECF No. 88) to "Exclude Argument or Evidence of Collateral Source Payments" is DENIED; and

6. The SJVIA's Motion to Preclude Testimony of Jennifer Walsh (ECF No. 83.) is GRANTED.

IT IS SO ORDERED.

Dated: __**January 30, 2020**__          /s/ *Erica P. Grosjean*
                                          UNITED STATES MAGISTRATE JUDGE

29